# MACFARLAND

*v.*

# WASHINGTON, ALEXANDRIA AND MOUNT VER-NON RAILROAD COMPANY.

APPEALABLE ORDERS; TEMPORARY RESTRAINING ORDERS; MUNICIPAL
REGULATIONS.

1. An order overruling a motion to dissolve a temporary restraining or-der granted *ex parte* and continuing the same, is in effect an order granting a temporary injunction, and is appealable, under section 7 of the act of Congress of February 9, 1893, creating this court; and such an appeal brings up the question of the propriety of the temporary injunction; *following* Electric Lighting Co. v. Met. Club, 6 App. D. C. 536, and Parsons v. Hill, 15 id. 532.

2. The fact that an electrical switch and appliances erected by a railway company without first obtaining the permission of the municipal authorities, as required by law, was installed for use in case of emergency only, and that no danger can result from temporarily en-joining the municipality from removing them, will not justify the continuance of a restraining order enjoining their removal until proof can be taken.

3. Where the Commissioners of the District ordered a railway company to remove an electric switch and appliances, installed by it at the intersection of certain streets without having obtained permission to do so, and the company, in a suit for an injunction, obtained an order temporarily restraining the Commissioners from executing their official order, it was *held*, on an appeal from an order overrul-ing a motion by the Commissioners to dissolve the restraining order, that, as it did not appear that they had exceeded their powers or abused their discretion or acted oppressively in ordering the re-moval of such construction, that the restraining order should be dissolved.

4. A statute or regulation looking to the public interest and safety will be upheld by the courts unless it is plain that it has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law.

No. 1089. Submitted June 4, 1901. Decided June 18, 1901.

HEARING on an appeal by the Commissioners of the Dis-

trict of Columbia, from an order of the Supreme Court of the District of Columbia overruling a motion to vacate a temporary restraining order and continuing the same until final hearing, and also on a motion by the appellee to dismiss the appeal. *Motion to dismiss overruled and order appealed from reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Andrew B. Duvall,* Attorney for the District of Columbia, and *Mr. C. A. Brandenburg,* Assistant Attorney, for the appellants.

*Mr. J. M. Wilson, Mr. A. S. Worthington* and *Mr. A. A. Hoehling, jr.* for the appellee.

1. The appeal should be dismissed. This is the ordinary case of a motion by a defendant to dissolve a pending injunction after he has filed his answer. The practice in this regard has long been settled, and will be found discussed in 3d Daniell's Chancery Pleading and Practice (3d American edition), top pages 1786 to 1788, and in 2d Beach's Modern Equity Practice, sections 781 to 786. The order appealed from expressly overrules the motion " to dissolve the restraining order heretofore granted." It is submitted that the fact that the order appealed from also continues the restraining order cannot affect the matter, because the overruling of the motion to dissolve left the prior order in force as a matter of course.

2. The appeal is from a preliminary injunction. We understand this court to hold that in appeals from interlocutory orders, where the court below is called upon to exercise its discretion, this court will not reverse such an order unless the case is a plain one. *The United States Electric Lighting Company* v. *The Metropolitan Club,* 6 App. D. C. 536.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is an appeal from an interlocutory order. On August 25, 1900, the Washington, Alexandria and Mount Vernon Railway Company filed a bill against the District commissioners to enjoin the execution of an official order to complainant to remove an electrical switch and appliances erected by it at the intersection of Maryland avenue and Fourteenth street southwest. On the same day an order was made restraining the defendants, as prayed, until the further order of the court upon hearing to be had on September 12, 1900. The next thing shown in the record is the sworn answer of defendants, filed October 13, 1900, controverting the material allegations of the bill and explaining the grounds of their action. April 1, 1901, the court overruled defendants' motion to vacate and discharge the restraining order and further ordered that the same be continued till the final hearing.

The defendants, treating this as an order for an injunction, took an appeal and perfected the same within the time required by law. The appellee moves to dismiss, on the ground that the appeal is not from an order granting an injunction within the contemplation of the seventh section of the act creating this court and defining its jurisdiction, but is merely from the interlocutory decree refusing the motion to dissolve the restraining order, and hence is not appealable save by special leave of the court.

It is clear that the original order was intended to operate as the ordinary temporary restraining order pending notice of preliminary hearing. Without such hearing and without special order continuing it in force, it seems to have been treated as continuing until further order might be made. The defendants' motion, after answer, brought the question on for hearing whether the order should be dissolved or should remain in force *pendente lite*. Though continued as a restraining order it had all the consequences of an injunction. Being in substance an injunction, it was clearly appealable. *U. S. Elec. L. Co.* v. *Met. Club,* 6 App. D. C.

536, 543.  And the appeal, though technically from the order overruling the motion to dissolve, brings up the only question involved, namely, the propriety of the temporary injunction.  *Parsons* v. *Hill,* 15 App. D. C. 532, 539.  The motion must, therefore, be overruled.

2. Passing now to the merits of the cause, we find no material conflict in the facts alleged in the bill and answer.

The appellee is a corporation of the State of Virginia authorized to construct and operate a passenger railway, operated by electric power, between the Potomac river and Mount Vernon.  By act of Congress of August 23, 1894 (28 Stat. 494), the corporation was authorized to lay double tracks on certain streets in the city of Washington, commencing on B street between Seventh and Eighth, northwest, thence westward along B to Thirteen-and-a-half street, thence northward on Thirteen-and-a-half street to E street, by single track, thence westward on E to Fourteenth street, on a single track, thence southward on Fourteenth street, using the tracks of the Belt Line street railway to the Potomac river, thence across the same.  This included the necessary switches, turnouts and other mechanical devices, " the number and location of which shall be approved by the commissioners of the District of Columbia."  (Sec. 1.)

" All rails, electrical and mechanical appliances, conduits, stations, and so forth, shall be of approved pattern and subject to the approval of the District commissioners."  (Sec. 4.)

Overhead wires are prohibited, except for 400 feet at a slip for ferry, etc., at foot of Fourteenth street (Secs. 5 and 1).  The power to make all needed trenches and excavations is subject to the condition of, " having first obtained the permission of the commissioners of the District."  (Sec. 7.)  " The said company shall run street railway cars propelled by underground cable or underground electric power."
*    *    *

" Provided: That whenever the foregoing route or routes may coincide with the route or routes of any duly incorporated street railway company in the District of Columbia

the tracks shall be used by both companies, which are hereby authorized and empowered to use such tracks in common, upon such fair and equitable terms as may be agreed upon by said companies; and in the event the said companies fail to agree upon equitable terms, either of said companies may apply by petition to the Supreme Court of the District of Columbia, which shall immediately provide for proper notice to and hearing of all parties interested, and shall have power to determine the terms and conditions upon which and the regulations under which the company hereby incorporated shall be entitled so to use and enjoy the track of such other street railway company, and the amount and manner of compensation to be paid therefor." (Sec. 11.)

Section 21 provides: " That all plans relating to the location and construction of said railway shall be subject to the approval of the commissioners of the District of Columbia, or their successors, and all work shall at all times be subject to their supervision." The operation of the new railway began in May, 1896. In Virginia it operated with an electric current of 550 volts from grounded generators with an overhead trolley. This crossed the Long bridge and terminated at the plow pit located at the foot of Fourteenth street.

The District commissioners required it to operate the line in the city from nongrounded generators, and this forced the company to obtain power from the United States Electric Lighting Company, which was working in the District. The volt current to be obtained from that company was one of 250 volts, and the appliances of the cars were adapted thereto. Under an act of Congress of June 24, 1898 (30 Stat. 488), the Anacostia and Potomac River Railroad Company acquired the Belt Line franchise, tracks, etc., and reconstructed the tracks for the underground electric system of propulsion as required by Congress.

This company and appellee being unable to agree upon terms of joint operation and maintenance of the tracks on Fourteenth street, between E street north and B street south, both appealed to the Supreme Court of the District

for a settlement of the same as provided in section 11 afore-
said of the act of 1894. The commissioners were not par-
ties to the proceeding. April 25, 1900, said court made a
decree. It appears that the current of the Anacostia com-
pany, which was necessary to be used for the operation of
both companies, was of 550 volts. This necessitated
changes, on the part of the appellee, in the appliances of its
cars, and it was compensated therefor. Said decree contains
the following clause upon which the appellee relies: "Said
Anacostia and Potomac River Railroad Company shall, at
its own cost, put in electrical switches at E street north, and
B street north and at B street south, to enable the Washing-
ton, Alexandria and Mt. Vernon Railway Company to con-
nect its own source of supply with its own conductor bars
for use in case of an accident, or in the event that the said
Anacostia and Potomac River Railroad Company shall
fail to furnish the current required as aforesaid."

The Anacostia company operated a metallic system with
nongrounded generators, the same as the United States Elec-
tric Lighting Company, which was the then source of supply
of appellee for its city service. Some time early in June,
1900, appellee installed a switch and connections at the inter-
section of Fourteenth street with Maryland avenue, so as to
obtain an operating current from its Virginia power plant.
No permission was asked of the commissioners for this in-
stallment. Hearing of it, they addressed the following com-
munication to the appellee on June 22, 1900:

"DEAR SIR: The commissioners are officially advised
that your company has connected its grounded system with
the metallic system within the District of Columbia. Not
only was this work done without the approval of the commis-
sioners, as required by the provisions of your charter, but is,
in the opinion of the commissioners, both objectionable and
unlawful, and I am directed to notify you to remove within
ten days from this date all constructions connected with this
work.                    "Respectfully,
        "(Signed)             W. TINDALL, *Secretary.*"

Replying thereto, the appellee disclaimed the intention to do an illegal act, and denied that any damage would occur from said action.

It also explained the necessity of having a means to procure power in event of accident, etc., to the Anacostia power system at any time. After some correspondence the commissioners, on August 23, 1900, notified appellee to remove its connections within forty-eight hours. Thereupon the bill was filed and the restraining order obtained.

Aside from the fact that the appellee had proceeded with the construction of the connecting appliances without applying to the commissioners for leave, and had thereby violated the law, the commissioners, under oath, set out the reasons that influenced them in ordering the removal of the same, and for which they would have refused permission, as follows:

" They admit that the Anacostia and Potomac River Railroad Company is part of a system of street railroads operating within the District of Columbia lines of railroad traversed by a great number of cars for local passenger traffic, and on the Anacostia and Potomac route aforesaid it operates its cars at intervals of about three minutes, and by means of its various connecting lines and switches it is able, in the event of accident or tie-up, to switch its cars to a connecting line, and that the complainant company is engaged in operating a through line of railroad from the city of Washington to Rosslyn, Alexandria, and Mount Vernon, in the State of Virginia, running its trains at intervals of about thirty minutes, and in the event of accident or failure to supply current on the aforesaid Anacostia route its traffic might be suspended and loss result therefrom, and, in order to guard against such emergency, the provision was inserted in the aforesaid decree requiring the Anacostia and Potomac River Railroad Company to put in certain electrical switches, etc. — that is to say, the complainant company anticipates the possibility of trouble in obtaining current from the Anacostia and Potomac River Railroad Company, and, while this is possible, these defendants, representing the public

and bound to protect the interest and property of the public, anticipate not only the possibility, but the extreme probability, of trouble, damage, and loss to the underground constructions, conduits, cables, pipes, sewers, etc., of the District of Columbia, and they say that experience has demonstrated that such loss and damage under similar conditions has resulted and will probably result to such underground constructions, and they further say that the commissioners of the District of Columbia have built conduits from Fourteenth and D streets along D street to and into the grounds occupied by Engine Company No. 2, on D street between Fourteenth and Fifteenth streets, and thence through said grounds to Ohio avenue, and thence along Ohio avenue across Fourteenth street and under the tracks of the complainant company into the building occupied by truck company C, and these defendants propose, within the next two months, to draw lead-covered cables into these conduits, in which will be contained the wires of the fire-alarm and police telegraph and telephone system. Wherever such lead-covered cables of the District of Columbia are run in conduits of the telephone company, they are bonded to the cables of the latter company, and are protected by the company's system. In these new conduits, however, no such protection can be provided."

It appears, also, from exhibits to the answer, that the commissioners had been observant of the great danger of the destruction of the underground pipes of the city by electrolysis, and on account of damage attributable to other plants connecting with Brightwood, had petitioned Congress to enact a law with ample penalty to prevent any person or company from furnishing electric current on a circuit or system, any portion of which may be grounded or connected to any grounded construction, or which is not thoroughly insulated from the ground.

The reports of two experts employed by appellee are attached to the bill, in which it is said that upon examinations made in company with the defendant's electrical engineer, they found no appearance of electrolytic action upon the ad-

jacent water-pipes and so forth, and could see no reason to
apprehend danger therefrom, by the use of appellee's con-
nection aforesaid.

Defendant's engineer reported making the tests, and
added:

" While these few tests, under circumstances which did
not represent every phase of the ordinary working condi-
tions, tend to show that the use of the grounded connection
from the Virginia power-house did not materially alter the
relations of the pipes and rails, yet I think it would be a
bad precedent to establish to allow such connections to be
used. The underground trolley system is supposed to be a
metallic circuit system operated from nongrounded generat-
ors. It will work no great hardship on the Mount Vernon
Railway Company or the City and Suburban Railway Com-
pany to furnish power to this section of the road from a
separate generator in the power station of the United States
Electric Lighting Company, past which the railroad tracks
run and which formerly supplied power to the road.

" Very respectfully,
" (Signed)          WALTER C. ALLEN,
*Electrical Engineer, D. C."*

3. It seems entirely unnecessary, at this time, to attempt
the interpretation of section 11 of the act of August 23, 1894,
and to determine the extent of the jurisdiction conferred
thereby upon the Supreme Court of the District, in the mat-
ter of making regulations, for the joint operation of the
Fourteenth street tracks, between E street north and B street
south, and to what extent, also, regulations so decreed would
supersede the general powers of regulation and supervision
that had been conferred upon the commissioners.

The commissioners have done nothing to impair the opera-
tion of that decree. They have not ordered, and do not seek,
the removal of the switches and electrical connections for
which the decree provides. These are capable of use, in case
of the emergency for which they provide, in obtaining the

power of the United States Electric Lighting Company, which, at the time of decree, was the source of appellee's supply. The switch and connections to which this suit alone relates are about two blocks from the point where the appellee leaves the tracks of the Anacostia company. They were not, and could not have been, included in the decree, because they are attached to the tracks belonging to the appellee and operated by it exclusively. That they are necessary to enable it to connect its Virginia grounded service with the joint service tracks, in case of need, does not bring them within the scope of the decree.

4. Having actually installed the new switch and appliances, for use only in case of emergency, the appellee contends that no immediate danger can, under the showing made, result from enjoining their removal, at least, until evidence can be taken and the fact of danger from the connection with a grounded generator service established. In this we cannot concur. The appellee appears in a court of equity asking to be upheld in a plain violation of law. Whatever its rights might ultimately be, it was required by law to submit the plan of proposed construction and location to the commissioners and ask for approval and leave to proceed. There is no excuse for its failure to obey this most reasonable requirement. Its duty was to respect and obey the law, and, in case of the denial of a plain right, to appeal to the courts for relief. To continue the temporary injunction in force, upon this ground alone, would tend to encourage a spirit of disobedience of the law.

5. Upon the facts presented, it does not appear that the commissioners have plainly exceeded their powers, or abused the discretion vested in them, and acted oppressively in requiring the removal of the connections in question.

They are charged by law with the duty of protecting the public health and promoting the safety of person and property in the District of Columbia, as well as with direct responsibility for the preservation and care of all public property. Some of this property, consisting of water mains and fire-alarm cables of immense cost and absolute necessity,

is -peculiarly exposed to injury and destruction by leaking or returning currents of electricity. The nature and conditions of electrolysis, and the means of its prevention and arrest, are not yet fully apprehended. The powers and duties of these executive officers are also, in a measure, legislative and judicial, for they are called upon to exercise judgment and discretion in the enactment and enforcement of rules and regulations in aid of the objects and duties aforesaid.

In addition to the general powers of supervision and control given them in the act conferring upon appellee its franchises in the District, they are granted the express power, by the act approved February 26, 1892, " to make and enforce all such reasonable and usual police regulations, in addition to those already made under the act of January 26, 1887, as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia." 27 Stat. 394. It does not appear that any general regulation of the nature of the subject-matter of this controversy has been made, but the language of the law is quoted in order to illustrate the general nature and extent of the powers conferred upon the commissioners.

A general regulation of constructions of the kind would seem to be impracticable, under all the circumstances to be taken into consideration, and the public safety can, apparently, be more efficiently and justly provided for by the requirement that all such constructions shall first be submitted to the commissioners for consideration and approval, and, if permitted, carried on under their immediate supervision.

In the course of judicial inquiry into the exercise of the powers intrusted to the commissioners, in a particular matter, it must be remembered that they, too, occupy a position of important public trust, as well as presumed impartiality. They are commissioned to stand between the public interests and welfare, on the one hand, and private indifference thereto and individual selfishness, upon the other.

MACFARLAND v. RAILROAD CO.

Opinion of the Court.

Whilst what they may deem for the general welfare is not to be promoted by unreasonable regulations that unnecessarily oppress the individual, it does not follow that one is unreasonable and oppressive, in a legal sense, because it may be inconvenient to the individual, as well as burdensome and oppressive, in a particular sense, as regards either his personal liberty or the uses of his property. In case of reasonable doubt whether public injury would follow a particular act, the performance of which is subject to their regulation or supervision, and which appears to be the very case here presented on the facts alleged in the bill and answer, it would seem both expedient and right to resolve the doubt in favor of the public interest.

Hence, it is the well-established rule of the courts, in the execution of their supervisory function, that a statute or regulation looking to the public interest and safety will be upheld save when plain that it has " no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law." *Hennington* v. *Georgia,* 163 U. S. 299, 303, 304; *B. & O. RR. Co.* v. *Dist. of Col.,* 10 App. D. C. 111, 128; *Dist. of Col.* v. *Hazel,* 16 App. D. C. 283, 288.

Looking to the sworn answer of the commissioners in this case, explaining the grounds of their action, with the reinforcement of the advice of the public electrical engineer, we are unable to find that their action in the premises has been in excess of their powers or in abuse of their discretion. As we had occasion to say in a former case: " Where the question is one of practical fact, unsettled by experience and resting in opinion, a court should surely hesitate to set up its judgment in opposition to that of the municipal officers, who, by virtue of their training, observation and experience in the performance of their duties, ought to be well informed and capable of arriving at satisfactory conclusions in such matters." *B. & O. RR. Co.* v. *Dist. of Col.,* 10 App. D. C. 128.

Our conclusion is, that there was error in refusing to dissolve the restraining order, and in continuing the same in

force *pendente lite.* For this the decree will be reversed, with costs, and the cause remanded with direction to vacate the restraining order, and take such further proceedings in the cause as may seem proper.                    *Reversed.*